Norma RANDOLPH, et al., Plaintiffs,

v.

Robert D. LIPSCHER, et al., Defendants.

Civ. No. 86–562 (AET).

United States District Court, D. New Jersey.

Aug. 25, 1986.

Frederic S. Kessler, Clapp & Eisenberg, Newark, N.J., for plaintiffs.

Andrea M. Silkowitz, Deputy Atty. Gen., Newark, N.J., for defendants Lipscher and the Justices of the Supreme Court of New Jersey.

Robert J. Hrebek, Sea Girt, N.J., for defendant Lanzaro.

## OPINION

THOMPSON, District Judge.

Plaintiffs Norma Randolph and Nancy Menke [1] bring this action to challenge the constitutionality of Rule 1:17-1 of the Rules Governing the Court of the State of New Jersey ["Rule"] the relevant parts of which are as follows:

The following persons in or serving the judicial branch of government shall not hold any elective office nor be a candidate therefor, nor engage in political activity, nor, without prior written approval of the Supreme Court, requested through the Administrative Director of the Courts, hold any other public office, position or employment:

a) Judges;

b) The Administrative Director of the Courts, the Clerk of the Supreme Court, the Clerk of the Superior Court, the Clerk of the Tax Court, and all employees of their respective offices, and official court reporters;

\* \* \* \* \* \*

f) Law secretaries, stenographers, sergeants-at-arms, court criers, assignment clerks, courtroom clerks, court attendants and all public employees regularly assigned to a judge or court;

\* \* \* \* \* \*

i) Clerks, deputy clerks, violations clerks and all persons employed by or regularly assigned to a municipal court.

Plaintiffs describe their challenges to the Rule in five counts, which may be summarized as follows:

*First Count:* The Rule violates court employees' First Amendment rights to free speech and association.

*Second Count:* The Rule creates a "chilling effect" on court employees' exercise of their First Amendment rights.

*Third Count:* The Rule is unconstitutionally vague.

*Fourth Count:* The Rule is unconstitutionally overbroad.

*Fifth Count:* The Rule fails to utilize the "least drastic means for achieving its purported purpose," *i.e.,* the regulation of speech and association.

The plaintiffs assert that the Rule is unconstitutional both *as applied* to each of them and *on its face.* They seek declaratory, injunctive and compensatory relief, as well as an award of attorney's fees and costs. Defendants are William Lanzaro, the Sheriff of Monmouth County and Ms. Randolph's employer; Robert Lipscher, the Administrative Director of the Courts of the State of New Jersey; and the Justices of the Supreme Court of the State of New Jersey.

On February 6, 1986, we signed an Order to Show Cause With Temporary Restraints, and on May 6, 1986, we signed an Order Granting Preliminary Injunction, to which defendants did not object. The effect of these orders was to preserve plaintiffs' employment status during this litigation. Ms. Randolph is currently on unpaid leave of absence, and Ms. Menke is presently employed as a clerk-typist, a position not within the scope of the Rule. Presently before the court is the motion of defendants Lipscher and the Justices of the Supreme Court of the State of New Jersey to dis-

---

1. The Amended Complaint also lists the National Association for the Advancement of Colored People ["NAACP"] as a plaintiff. By a "Stipulation of Dismissal as to NAACP" filed June 17, 1986, the parties agreed to the dismissal of all claims asserted by that plaintiff, while preserving those of Ms. Randolph and Ms. Menke. The claims of the NAACP were isolated in the Sixth Count of the Complaint.

miss the complaint.[2] They argue that this court does not have subject matter jurisdiction over this action, which they argue seeks nothing less than appellate review of decisions of the New Jersey Supreme Court. They further argue that the claims of plaintiffs, to the extent that they are within this court's jurisdiction, are barred by the doctrine of *res judicata*.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts which gave rise to New Jersey Supreme Court's decisions, and subsequently to the present action, are essentially undisputed. We address them only to the extent that they are relevant to the present motion.

Randolph was hired by defendant Lanzaro in January 1983.[3] Her position, whether described as that of "court attendant" or "court aide," involves "the performance of nonsecurity tasks related to the conduct of courtroom business" in the Monmouth County Court House in Freehold, New Jersey. *In the Matter of Randolph*, 101 N.J. 425, 428, 502 A.2d 533 (1986), *cert. denied* —— U.S. ——, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986) ["*IMO Randolph*"]. Randolph submitted a list of her public activities for review pursuant to the Rule. The list revealed that Randolph was a member of five organizations with formal ties to a non-judicial branch of state or local government: the Monmouth County Mental Health Board, the Freehold Borough Municipal Youth Guidance Council, the Freehold Borough Citizens Participation Committee for HUD, the Freehold Borough Citizens Advisory Council, and the Freehold Borough Board of Assessment. It also revealed that she was an officer of two non-governmental public interest organizations—she was a member of the executive committee of the Greater Red Bank Chapter of the NAACP, and Second Vice-President of the United Progres-sive Homeowners and Taxpayers Association.

By a letter dated March 31, 1983, the New Jersey Administrative Office of the Courts informed Randolph that she could not, consistent with the Rule, continue to serve in the governmental organizations, and that she could not serve as an officer in the two private organizations. On May 6, 1983, the Assignment Judge of Monmouth County entered an Order reflecting this interpretation of the Rule. On May 30, 1983, defendant Lanzaro petitioned the New Jersey Supreme Court for review of the Order. The New Jersey Supreme Court granted the petition on June 16, 1983. 94 N.J. 549 (1983). A judge of the Superior Court of Monmouth County conducted a factual hearing into the nature of Randolph's activities as a member of the above-listed organizations.

The Superior Court judge submitted to the New Jersey Supreme Court findings of fact to which Randolph filed no substantive exceptions. The New Jersey Supreme Court accepted briefs on behalf of Randolph, Sheriff Lanzaro, the Judiciary, and the NAACP, as *amicus curiae*, and heard oral argument. In the brief submitted on behalf of Randolph by her present counsel, the court was urged to interpret the rule narrowly, or to refashion it so as to make it less restrictive. The arguments were couched in both discretionary and constitutional terms, and the First Amendment arguments before this court were prominant.

The New Jersey Supreme Court issued a *per curiam* decision affirming the decision of the Assignment Judge of Monmouth County. The comprehensive opinion for the majority of the court weighed Randolph's First Amendment arguments against the particular—even peculiar—need of the New Jersey court system to insulate itself from the incidence or appearance of political influence. *IMO Ran-*

---

**2.** Defendant Lanzaro has not joined in this motion to dismiss. Our use of the term "defendants" in this opinion is intended to refer only to the moving defendants.

**3.** For the history as to Randolph's claims we rely heavily on the factual discussion contained in *In the Matter of Randolph*, 101 N.J. 425, 502 A.2d 533 (1986), *cert. denied* —— U.S. ——, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

*dolph,* 101 N.J. at 430–31, 502 A.2d 533, *citing Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The majority concluded that the proper result of the balancing was that Randolph could continue none of her listed activities while acting as a uniformed aide in the New Jersey court system. It reached this conclusion through,

> adher[ing] to the time-tested commitment of our judicial system to an integrity so austere that not only judges but "others officially associated with the court system have been *wholly divorced* from involvement in *partisan or other political activity,* as a necessary sacrifice for the sake of judicial integrity and the public appearance thereof." (Chief Justice Hughes in *In re Gaulkin, supra,* 69 N.J. [185] at 189 [, 351 A.2d 740] [(1976)] (emphasis supplied)).

101 N.J. at 455, 502 A.2d 533.

The New Jersey Supreme Court produced two minority opinions as well, with one justice concurring in part and dissenting in part, and two justices dissenting. The minority opinions, like the majority, undertook to apply the balancing test of *Pickering v. Board of Education, supra* and *Connick v. Myers, supra* to the task of weighing Randolph's federal constitutional rights to free speech and association against the judiciary's interest in independence and the appearance of integrity and impartiality.[4]

The facts surrounding the New Jersey Supreme Court's decision regarding Menke's employment may be stated tersely. Upon her appointment to the position of Deputy Court Clerk of the Municipal Court of Lavallette, an inquiry was apparently addressed to the Assignment Judge of Ocean County regarding Menke's compliance with the Rule. The record of the present action does not reveal how or by whom this "inquiry" was made, or what its substance was. It appears, however, that the Assignment Judge forwarded the inquiry to the Administrative Office of the Courts for consideration. Menke submitted two letters to the Administrative Office of the Courts or the New Jersey Supreme Court in which she described her public activities. On February 5, 1986, defendant Lipscher notified Menke that the New Jersey Supreme Court had decided that she could not, consistent with the Rule, serve as a Deputy Clerk and as "an officer of, executive of, or spokesperson for" the Save Our Oceans Committee of Lavallette. *See* Appendix to Defendants' Brief in Support of their Motion to Dismiss, p. 122a. Although Menke requested the opportunity to appear before the New Jersey Supreme Court prior to its decision, or to know the materials upon which it would base its decision, she was permitted to do neither. *See, generally,* Defendant's Appendix pp. 122a–131a.

We now address defendants' motion.

## II. JURISDICTION

■ Defendants argue that the present action is an attempt to invoke the jurisdiction of this court for the purpose of securing appellate review of final decisions of the New Jersey Supreme Court. They argue that we may not exercise such jurisdiction, as jurisdiction to review a final decision of a state's highest court is reserved for the United States Supreme Court. They conclude that the present action, to the extent it seeks review of the Rule *as applied,* must be dismissed for lack of subject matter jurisdiction.

Defendants accurately characterize the limits of this court's subject matter jurisdiction. It is well settled that "lower federal courts possess no power whatever to sit in direct review of state court decisions." *Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 296, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970); *Rooker v. Fidelity*

---

**4.** Randolph sought review of this decision, through a petition for certiorari, in the United States Supreme Court. Certiorari was denied with three justices dissenting. —— U.S. ——, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

*Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). Federal jurisdiction to review state court decisions is reserved, by the terms of 28 U.S.C. § 1257, for the United States Supreme Court. *Texaco, Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1142 (2d Cir.1986); *Thomas v. Kadish*, 748 F.2d 276, 277 (5th Cir.1984) *cert. denied* — U.S. —, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985); *Schwartz v. Judicial Retirement System of New Jersey*, 584 F.Supp. 711, 715 (D.N.J.1984).

Plaintiffs respond by arguing that they are not seeking appellate review of an adjudication by the New Jersey Supreme Court, and that their constitutional challenge to the Rule, both on its face and as applied is therefore within this court's original jurisdiction. They argue that the New Jersey Supreme Court did not act, with respect to Menke or Randolph, in a judicial capacity, but rather in a rule-making or ministerial capacity, and that its actions may be reviewed in the same fashion as those of any non-judicial state department or agency.

Our primary point of reference in deciding this aspect of defendants' motion is *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In that case, the United States Supreme Court considered whether a federal district court might permissibly review decisions of the District of Columbia Court of Appeals[5] denying applicants' petitions for the waiver of certain local rules for bar admission. The two applicants—Feldman and Hickey—sought to be admitted to the District of Columbia bar notwithstanding their failure to attend law school approved by the American Bar Association as required by the applicable local rule. Feldman applied to the Committee on Admissions of the District of Columbia Bar for a waiver of the rule. After receiving an initial denial of a waiver, Feldman sought and was granted an informal hearing before the Committee. The Committee once again denied the waiver, refer-

ring Feldman to the District of Columbia Court of Appeals for further action. Feldman submitted a petition for waiver to the District of Columbia Court of Appeals. The petition contained argument supporting his claim that his background was such that a waiver could reasonably be granted. Some months later an attorney acting in Feldman's behalf submitted a supplemental letter urging the grant of a waiver, and setting forth legal argument in support of the request. The Chief Judge of the District of Columbia Court of Appeals responded to the second letter indicating that the court considered adherence to the rule to protect valuable interest of the bar. The court subsequently issued a *per curiam* order denying the petition. *See* 460 U.S. at 464–468, 103 S.Ct. at 1305–07.

Hickey's first step in his attempt to obtain a waiver was his petition to the District of Columbia Court of Appeals. His petition included a factual discussion of his background, but advanced no legal argument in support of a waiver. The court issued a *per curiam* order denying his petition. *See* 460 U.S. at 470–72, 103 S.Ct. at 1308–09.

Both applicants subsequently filed complaints in the United States District Court for the District of Columbia. Both stated claims asserting that the refusal of the Court of Appeals for the District of Columbia to grant a waiver of the general rules was in violation of, *inter alia*, the Fifth Amendment and the Sherman Act. The United States District Court dismissed the complaints, finding that it lacked subject matter jurisdiction over what appeared to be requests for appellate review of decisions of the local courts of the District of Columbia. 460 U.S. 468–70, 472–73, 103 S.Ct. 1307–08, 1309–10.

The United States Court of Appeals for the District of Columbia Circuit reversed as to the constitutional claims, finding that the decisions of the Court of Appeals for

5. The District of Columbia Court of Appeals is the highest local court of the District of Columbia. For purposes of the issues before the Court in *Feldman,* and those before us today, it is the

equivalent of a state supreme court. *See Feldman, supra,* 460 U.S. at 463–64, 103 S.Ct. at 1305; *Key v. Doyle,* 434 U.S. 59, 64, 98 S.Ct. 280, 283, 54 L.Ed.2d 238 (1977).

the District of Columbia were not adjudicative in nature, and therefore did not bar subsequent litigation in the United States District Court. The court summarized its analysis in this regard as follows:

> [T]he proceedings before the Court of Appeals can hardly be said to have cast the constitutional and antitrust questions in "such a form that the judicial power [was] capable of acting on [these issues]." Appellants, we repeat, did not challenge the validity of the rule, but, as in *Ktsanes* [*v. Underwood*, 552 F.2d 740, 743 (7th Cir.1977) *cert. denied*, 435 U.S. 933 [, 98 S.Ct. 1508, 55 L.Ed.2d 530] (1978) ], "ask[ed] for ministerial action, not judicial determination." We thus conclude congruently with *Ktsanes* that "[t]he denial of [their] petition[s] was made by the court acting in an administrative capacity," for the court was not in position to act in any other way. And we further agree that "that denial did not present a case or controversy cognizable by an Article III court and, thus, was not appealable to the Supreme Court of the United States."

*Feldman v. Gardner*, 661 F.2d 1295, 1318 (D.C.Cir.1981) (Footnotes omitted).

The United States Supreme Court vacated the decision of the District of Columbia Circuit, and remanded to the District Court. In its opinion as to the jurisdiction issue, the Court noted that "[a] crucial question in this case ... is whether the proceedings before the District of Columbia Court of Appeals were judicial in nature." 460 U.S. at 476, 103 S.Ct. at 1311. This is a question, the Court found, of federal, not local law, 460 U.S. at 476 n. 13, 103 S.Ct. at 1311 n. 13, *citing In re Summers*, 325 U.S. 561, 565, 65 S.Ct. 1307, 1310, 89 L.Ed. 1795 (1945). In examining the local proceedings in order to answer this question, the Court found that "[t]he form of the proceeding is not significant. It is the nature and effect which is controlling." 460 U.S. at 478, 103 S.Ct. at 1312, *quoting In re Summers, supra*, 325 U.S. at 567, 65 S.Ct. at 1311. The "nature and effect" of the proceedings were analyzed as follows:

> The proceedings were not legislative, ministerial, or administrative. The District of Columbia Court of Appeals did not "loo[k] to the future and chang[e] existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, at 226, 29 S.Ct. 67 at 69, 53 L.Ed. 150. Nor did it engage in rulemaking or specify "the requirements of eligibility or the course of study for applicants for admission to the bar...." *In re Sumers, supra*, 325 U.S. at 566, 65 S.Ct. at 1310. Nor did the District of Columbia Court of Appeals simply engage in ministerial action. Instead, the proceedings before the District of Columbia Court of Appeals involved a "judicial inquiry" in which the court was called upon to investigate, declare, and enforce "liabilities as they [stood] on present or past facts and under laws supposed already to exist." *Prentis v. Atlantic Coast Line Co., supra*, 211 U.S. at 226, 29 S.Ct. at 69.

460 U.S. at 479, 103 S.Ct. at 1313. The Court found dispositive, on the jurisdiction issue, the fact that the Court of Appeals for the District of Columbia had applied the local rule to the particular facts of Feldman's and Hickey's petitions, and rendered decisions on the merits of their requests.

The parallels between the facts in *Feldman* and those presented by the present plaintiffs are apparent. In both cases, the local courts were asked to consider particular facts related to the application of a local rule. In both cases the highest local court considered the facts presented and rendered a decision on the merits of the case. Plaintiffs maintain, however, that we have subject matter jurisdiction over their constitutional challenge to the Rule as applied to them. They argue that the New Jersey Supreme Court's decision may be regarded not as adjudicative, but rather as the "making [of] a new rule to be applied thereafter to all or some part of those subject to its power," *Feldman*, 460 U.S. at 479, 103 S.Ct. at 1313, or as "a ministerial act which is performed by virtue of [its] judicial pow-

er, such as the appointment of a clerk or bailiff," *id.* at 477–78, 103 S.Ct. at 1312–13, *quoting In re Summers, supra,* 325 U.S. at 566, 65 S.Ct. at 1310. We are unpersuaded by these arguments, and we find that *Feldman* requires that we dismiss for lack of subject matter jurisdiction the plaintiffs' attack on the Rule as applied.

In arguing that the New Jersey Supreme Court's decisions were exercises of its rule-making authority, plaintiffs rely heavily on that court's obvious interest, at least in the context of Randolph's petition, in defining the scope of the Rule for the future reference of court employees and staff. The briefs submitted to the New Jersey Supreme Court addressed issues not directly applicable to Randolph's case. For example, the parties to Randolph's state proceedings briefed the issue of whether due process requirements necessitated factual hearings in connection with the application of the Rule, notwithstanding the fact that Randolph had been provided with a factual hearing. They also point to the fact that the slip opinion of *IMO Randolph* contains the caption "On petition for review of Rule 1:17–1." We find plaintiffs' interpretation of *IMO Randolph* as a rule-making exercise strained; it appears that the court intended to provide guidance as to the interpretation of the Rule in a fashion typical in our system of jurisprudence—through a detailed application of the Rule to the facts of a particular case.

Even if we were to construe *IMO Randolph* as the propagation of a new rule, this finding would not necessitate a finding that the court did *not* intend an adjudication of the facts of Randolph's case. The United States Court of Appeals for the Second Circuit, when faced with the argument that the New York Supreme Court, Appellate Division, intended to make a rule in issuing an opinion in a disciplinary matter, reasoned in the following fashion:

> It is possible that a state court could combine in a single opinion an adjudication of a grievance complaint with a promulgation of what amounts to a new rule. Of course, every application of a

rule to the facts of a particular case results in some "new" refinement of the rule, and *Feldman* cannot be circumvented by characterizing all constructions of a rule as the promulgation of new rules. *Zimmerman v. Grievance Committee of the Fifth Judicial District of the State of New York,* 726 F.2d 85, 86 (2d Cir.) *cert. denied* 467 U.S. 1227, 104 S.Ct. 2681, 81 L.Ed.2d 876 (1984). We must find that the court in *IMO Randolph* was not engaged in rule making to the exclusion of the consideration of the merits of the facts of the Randolph petition. The discussion is framed by reference to Randolph's particular situation. *Feldman* cannot, then, be avoided by construing *IMO Randolph* as a rule-making proceeding.

Neither can we construe the actions of the court as ministerial or administrative. Plaintiffs argue that the Menke proceedings before the New Jersey Supreme Court were in the nature of a discretionary employment decision for the court, and not an adjudication of present rights against the background of law. They make reference to the fact that the court considered Menke's case in an administrative session, and that Menke received notification of a decision not from the court, but from the Administrative Director of the Courts. They argue that the setting was more like one in which the court acted as a business manager than as a court of law.

Plaintiffs correctly argue that courts do conduct affairs in an administrative, as opposed to adjudicative function. *See Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980); *Schwartz v. Judicial Retirement System of New Jersey, supra,* 584 F.Supp. at 716. The New Jersey Supreme Court does not, by virtue of its being a court, lose its capacity to act as an employer of court staff or as an administrator of the court system. The characterization of the capacity in which the New Jersey Supreme Court acted may not be made by reference to the title assigned to the matter by that court; the question of whether that court acted in

an adjudicative capacity is, rather, a question of federal law. *See In re Summers, supra,* 325 U.S. at 565, 65 S.Ct. at 1310.

In the *In re Summers* case, the United States Supreme Court found that the Illinois Supreme Court's decisions rendered in response to bar admissions petitions were judicial acts notwithstanding the determination by the Illinois Supreme Court that these decisions constitute ministerial acts for purposes of state law. *Id.,* at 325 U.S. at 565-66, 65 S.Ct. at 1310-11. The United States Supreme Court was persuaded by the facts that the petitioner asserted a "claim of a present right" to the Illinois Supreme Court, and that the Illinois court ruled on the merits of that claim sufficient for purposes of federal law to identify the proceedings as judicial rather than ministerial.

Following the decision in *Feldman,* courts have consistently found state court decisions regarding the application of bar rules to be judicial rather than ministerial, even when the decisions are made not by the state's supreme court, but by a committee appointed by that court. *See Thomas v. Kadish, supra,* 748 F.2d at 282; *Nordgren v. Hafter,* 789 F.2d 334, 336 (5th Cir. 1986). The determination in these cases turns on whether the state court or its designee considers a present claim of right by applying the terms of a rule to the facts of a petitioner's case. *Nordgren v. Hafter, supra,* at 336.

We find that the most instructive factual comparison is with *Feldman.* In that case both petitioners sought to have the clear language of a rule avoided on the strength of discretionary and equitable arguments. While Feldman's attorney submitted some legal argument in favor of a waiver of the rule, the United States Supreme Court did not consider that determinative on the issue. The Court considered Hickey's case, where no legal argument was offered, and found that the decision was judicial:

> Hickey's petition called upon the District of Columbia Court of Appeals to consider policy and equitable arguments in deciding whether to waive the rule. The fact that Hickey did not cite case authority in support of his arguments or make any explicitly legal contentions does not render the proceedings nonjudicial. The court still was required to determine if Hickey's qualifications and background fulfilled the basic purposes of the rule sufficiently to justify a waiver and, if not, whether equitable considerations compelled a waiver.

*Feldman,* 460 U.S. at 481, 103 S.Ct. at 1314. Menke, like Hickey, asked the reviewing court to apply the relevant rule to the facts of her case while keeping in mind the "policy and equitable arguments" against a strict construction of the rule.

We find that the proceedings before the New Jersey Supreme Court in both Randolph's and Menke's cases were judicial for purposes of federal law. We therefore are without jurisdiction to consider their attacks on the Rule as applied. We now turn to defendants' argument that the doctrine of *res judicata* mandates the dismissal of plaintiffs' challenge to the Rule on its face.

## III. RES JUDICATA

■ In *Feldman* the Court found that the federal district court, while it did not have subject matter jurisdiction over those claims which sought review of local court judicial decisions, did have jurisdiction over the complaints to the extent that they "mounted a general challenge to the constitutionality" of the bar admissions procedures. 460 U.S. at 483, 103 S.Ct. at 1315. In Part II, *supra,* we found that we must dismiss those portions of the complaint which challenge the Rule "as applied" to plaintiffs by the New Jersey Supreme Court. We now address those portions of the complaint which assert facial challenges to the Rule.

After discussing the jurisdictional impediments to the plaintiffs' action, the Court in *Feldman* declined to reach the issue regarding the possible preclusive effect of the prior local proceedings. 460 U.S. at 487-88, 103 S.Ct. at 1317-18. In dictum, however, the Court suggested that a party's failure to raise a federal constitutional

claim in state court may result in its being precluded from raising that claim in subsequent federal litigation. 460 U.S. 482–84 n. 16, 103 S.Ct. at 1314–16 n. 16. The Court, in the course of criticizing the opinion in *Dasher v. Supreme Court of Texas,* 658 F.2d 1045 (5th Cir.1981), found that a litigant may not, in all cases, withhold his federal claims from a state forum in order to present them to a federal court.

In the following term, the Court produced the rule to implement the policy described in footnote 16 of *Feldman.* It held that a federal court assessing the issue or claim preclusive effect of a state court decision "must give to the state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *see Al-Khazraji v. St. Francis College,* 784 F.2d 505, 509 (3d Cir.1986). In *University of Tennessee v. Elliott* —— U.S. ——, ——, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986), the Court expanded the *Migra* rule, holding that federal courts must apply the claim and issue preclusion law of the forum state not only to judgments rendered in state courts following traditional litigation, but also to agency decisions rendered after quasi-judicial proceedings. The preclusive effect of the decisions of the New Jersey Supreme Court must, then, be determined by reference to the law of New Jersey.

New Jersey courts describe *res judicata* as "an ancient doctrine which contemplates that when a controversy between parties is once fairly litigated and determined it is no longer open to relitigation." *Lubliner v. Board of Alcoholic Beverage Control,* 33 N.J. 428, 435, 165 A.2d 163 (1960). In 1935 the Court of Errors and Appeals, then New Jersey's highest court, described the doctrine as follows:

> "The doctrine of *res judicata* is plain and intelligible and amounts simply to this, that a cause of action once finally determined, without appeal, between the parties, on the merits, by a competent tribu-

nal, cannot afterwards be litigated by a new proceeding either before the same or any other tribunal." *Foster v. The Richard Busteed,* 100 Mass. 409 [1868].

*Freudenreich v. Mayor and Council of the Borough of Fairview,* 114 N.J.L. 290, 292, 176 A. 162 (E. & A.1935). Prerequisites to the bar of further litigation ordinarily include the entry of a final judgment, *The Hills Development Co. v. Township of Bernards,* 103 N.J. 1, 59, 510 A.2d 621 (1986); *Flood v. Besser Co.,* 324 F.2d 590, 591 (3d Cir.1963), and a full and fair opportunity to litigate, *Lubliner, supra,* 33 N.J. at 437–41, 165 A.2d 163; *Mancuso v. Borough of North Arlington,* 203 N.J.Super. 427, 432, 497 A.2d 238 (Law Div.1985). New Jersey has adopted the "entire controversy doctrine," a near relative of the doctrine of *res judicata,* by which a party is required to assert all possible claims related to a single controversy in the same action, or be banned from raising them in future actions. *Malaker Corp. Stockholders Protective Committee v. First Jersey National Bank,* 163 N.J.Super. 463, 395 A.2d 222 (App.Div.1978), *certif. denied,* 79 N.J. 488, 401 A.2d 243 (1979); *see Aetna Insurance Co. v. Gilchrist Brothers, Inc.,* 85 N.J. 550, 428 A.2d 1254 (1981); *Melikian v. Corradetti,* 791 F.2d 274 (3d Cir. 1986).

New Jersey courts bar the relitigation of finally determined issues, through the doctrine of collateral estoppel, when that issue has been squarely placed in issue, and the party against whom the bar is asserted has had "a full and fair opportunity to litigate the issues in the first action." *Eatough v. Board of Medical Examiners,* 191 N.J.Super. 166, 175, 465 A.2d 934 (App.Div.1983); *see New Jersey Manufacturers Insurance Co. v. Brower,* 161 N.J.Super. 293, 391 A.2d 923 (App.Div.1978); *New Jersey-Philadelphia Presbytery v. New Jersey State Board of Higher Education,* 654 F.2d 868 (3d Cir.1981). The decision in the first action must be "sufficiently firm to be accorded conclusive effect." *Restatement (Second) of Judgments,* § 13 at 132 (1980), quoted in *The Hills Development Co. v. Township of Bernards, supra,* 103 N.J. at

59, 510 A.2d 621. The application of the collateral estoppel doctrine is not automatic, and should not be applied "if there are sufficient countervailing interests." *In the Matter of Coruzzi*, 95 N.J. 557–568, 472 A.2d 546 (1984); *see The Hills Development Co.*, 103 N.J. at 59–60, 510 A.2d 621.

We have applied the law of New Jersey to the situations presented by Randolph and Menke. We believe that, as to Randolph, the result is clear: she may not relitigate in this forum her claim that the Rule is unconstitutional on its face. As we have described previously in this opinion, Randolph's attorney was given an opportunity to raise any and all challenges to the constitutionality of the Rule. Through the brief of Randolph's counsel, and that of *amicus* before the New Jersey Supreme Court, the essentials of the First Amendment claims set forth in the amended complaint in the present action were presented. The Superior Court order which Randolph appealed to the New Jersey Supreme Court was a judgment holding that the Rule could be applied to bar Randolph from acting as a Courtroom Aide unless and until she ceased her "political" activities. The affirmance of that order in *IMO Randolph* must be considered a final judgment barring further litigation of the claim determined thereby. To the extent that Randolph attempts to raise new First Amendment claims before this court, she is barred by the entire controversy doctrine, *Malaker Corp., supra*, and the holding of *Migra, supra*, from raising them at this time. The argument that there is no "final judgment" because the New Jersey Supreme Court invited Randolph to return should her situation change is unconvincing. The court rendered a decision on the facts before it, as they existed. The fact that Randolph might once again be a petitioner before the court, should she change her circumstances or should the court change the rule does

not deprive the decision of finality as to the issues decided in *IMO Randolph*.

Randolph argues that she should not be barred by the decision in *IMO Randolph* because she was not a party to the action. We find this argument unpersuasive. The state court proceedings were obviously adversarial in nature. Randolph's attorney was permitted to enter an appearance, file briefs, and argue on Randolph's behalf before the New Jersey Supreme Court. We believe that the courts of New Jersey would consider Randolph a party to *IMO Randolph* for purposes of claim preclusion. Under New Jersey law, claim preclusion is addressed as one of "judicial fairness," *Crispin v. Volkswagenwerk, A.G.*, 96 N.J. 336, 343, 476 A.2d 250 (1984), and in certain circumstances even a non-party to a proceeding could be barred by a resulting judgment from litigating the claims anew. *See Melikian v. Corradetti, supra*, 791 F.2d at 280. Certainly Randolph, who was the central figure in the state proceedings, and was provided with an opportunity to raise any issue related to the validity of the Rule, must be barred under New Jersey law from relitigating those claims.

■ We have found that the decision in *IMO Randolph* bars Randolph's claims in this court. We have examined the record as to Menke, and we find that her situation differs markedly from Randolph's with respect to claim and issue preclusion.

We must initially reject plaintiffs' argument that we are not required to apply the principles of issue and claim preclusion to proceedings which were not adjudicated in a traditional court setting. The United States Supreme Court in *University of Tennessee v. Elliott, supra*, —— U.S. at ——, 106 S.Ct. at 3226, held that we are bound by all state adjudications to the extent required by state law.[6]

---

6. The Court left open the possibility that a party could, under federal law, avoid the preclusive effect of a state decision if he had not been afforded "an adequate opportunity to litigate." —— U.S. at ——, 106 S.Ct. at 3226, *quoting United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d

642 (1966). In such a situation, the party seeking to avoid the bar under state law would presumably argue that the state law deprived him of due process guaranteed by the Fourteenth Amendment. *See, New Jersey-Philadelphia Presbytery v. New Jersey State Board of Higher Education, supra*, 654 F.2d at 876. Our

We are persuaded that Menke's facial challenge to the Rule is not barred by prior state proceedings. The documents submitted in support of defendants' motion indicate that the only opportunity Menke had to "litigate" the facial validity of the Rule was her submission of two letters which set forth the details of her "political" activities and criticized the *IMO Randolph* opinion on what may be construed as First Amendment grounds. *See* Defendants' Appendix, pp. 122a–131a. The parties agree that the review of her case was not undertaken at Menke's request and that she was not permitted to appear before any court or administrative panel dealing with her case; indeed, she was not permitted to know what the ultimate fact-finder, the New Jersey Supreme Court, considered in making its decision.

The review process experienced by Menke may instructively be compared to that established by the New Jersey Supreme Court for cases involving attorney discipline. The New Jersey Supreme Court has appointed staff attorneys for an Office of Attorney Ethics, as well as members of District Ethics Committees. The Committees are made up of two nonlawyers and four lawyers. N.J.Ct. Rule 1:20–2,3. When reports of attorney misconduct are received, a Committee conducts an investigation. It may issue a "private reprimand," in which case no formal hearing is held unless the respondent attorney requests a hearing. If, after investigation, the Committee determines that other, more serious sanctions may be appropriate, the formal hearing provisions of N.J.Ct. Rule 1:20–3(h)–(p) apply. The rule provides for formal notice, subpoena power, the right to counsel, limited discovery, and a full adver-

sary hearing. Review of a determination of the Committee following the hearing may be appealed to the Disciplinary Review Board, and finally to the New Jersey Supreme Court. N.J.Ct. Rule 1:20–4,5. A respondent may raise constitutional issues at the hearing level, and raise them on appeal to the New Jersey Supreme Court. N.J.Ct. Rule 1:20–5(c).

In contrast, the decision made with respect to Menke's ability to perform court-related service was undertaken without formally structured procedures. We do not intend to suggest by this comparison that the procedure undertaken in Menke's case was flawed in any regard; we intend only to compare it with an extant procedural scheme which appears to produce decisions which meet the standards set by *Lubliner* and *Eatough* for issue and claim preclusive effect.

We find that Menke did not have a "full and fair opportunity to litigate" the First Amendment challenges to the Rule within the meaning of *Lubliner* and *Eatough*. The *Lubliner* court analyzed a number of cases which discussed the preclusive effect of "quasi-judicial" proceedings. It cited with approval cases which looked to determine whether the proceedings were "formal and adversary," *Russell v. Tenafly Board of Adjustment*, 31 N.J. 58, 65–66, 155 A.2d 83 (1959), and whether the rules governing the proceedings in question provided "notice, hearing, finality and review." *See Central Home Trust Co. v. Gough*, 5 N.J.Super. 295, 68 A.2d 848 (App.Div. 1949).[7]

It is clear from these decisions that a final decision resulting from the New Jersey attorney disciplinary proceedings discussed above would have preclusive effect

determination, *infra,* that state law does not bar Menke's facial challenge to the Rule obviates any need to address this issue.

7. These standards mirror those set forth in § 83 of the *Restatement (Second) of Judgments* (1980). In that section, a series of factors is identified by which the preclusive effect of quasi-judicial decisions are to be assessed. The factors include adequate notice, the right to present factual and legal materials in an adver-

sary setting, and well-settled rules of finality. *Compare Lubliner,* 33 N.J. at 437, 165 A.2d 163 with *Restatement (Second) of Judgments* § 83(2), pp. 266–67 (1980); *see also In the Matter of Coruzzi, supra,* 95 N.J. 557, 472 A.2d 546 (1984) (Similar standards in assessing collateral estoppel); *Glictronix Corp. v. American Telephone and Telegraph Co.,* 603 F.Supp. 552 (D.N. J.1984) (Similar standards in assessing *res judicata* ).

under New Jersey law. Menke's proceedings, in contrast, cannot be regarded as having been adversary in nature. The "hearing" that she did receive consisted of her letter to the Administrative Office of the Courts and an unsolicited letter to the New Jersey Supreme Court.

We now address a final point raised by defendants in the course of their argument that Menke's claims are barred by *res judicata*. In their reply brief, defendants argue that Menke is barred under *Migra* from attacking the Rule in this forum because she had a full and fair *opportunity* to raise any issue, but did not do so. They support this argument by reference to a footnote in the majority opinion in *IMO Randolph*, which states:

Each member of the judiciary or court support personnel who applies to the court for permission to serve with an organization receives the same consideration with respect to the decisional process and factual hearings can be entertained in any proceeding appropriate to decision.

101 N.J. at 439 n. 4, 502 A.2d 533. Defendants argue that Menke must have been aware of the *IMO Randolph* opinion because she referred to the opinion in her letter to the New Jersey Supreme Court. They conclude that the language of the footnote, of which Menke was aware, provided her with an avenue by which she could raise any and all issues now before this court, and that she is therefore barred from presenting them at this time. This argument fails for two reasons.

First, we do not agree that the language contained in a footnote of an opinion provides "notice" of issues and procedures as required under New Jersey law as a prerequisite to the imposition of issue or claim preclusion. In this case, it appears from the record provided by defendants that Menke's only previous knowledge of *IMO Randolph* was drawn from an editorial clipped from a newspaper. Defendants' Appendix, p. 127a. It is probable that the editorial, which was not made part of the record, did not provide a discussion of the procedures available to persons in Menke's position.

Second, we do not believe that the language quoted evidences an intent on the part of the New Jersey Supreme Court to provide for formal, quasi-judicial proceedings in every case, but rather in those cases selected, by unstated criteria, for fuller review. This belief is supported by the very facts before us—Menke was neither afforded nor offered the type of process which the New Jersey Supreme Court had described in *Lubliner* as prerequisite to the imposition of a bar on future litigation. Rather, the court obviously intended to continue considering each case involving an application of the Rule in an administrative, ministerial fashion, no doubt in the interest of the expedient management of the courts of New Jersey.

It may well be that the method is an entirely proper and correct method for screening court personnel. We have examined the procedure today not for the purpose of passing on its *validity* under the laws of the United States or New Jersey, but rather for the very limited purpose of determining whether, under New Jersey law, the process by which the screening process was applied in Menke's case was such that she should be barred from litigating claims related to that process in this court. We find, without any comment on the merits of that procedure, that Menke is not barred under New Jersey law from challenging the validity of the Rule on its face.

## IV. "INTERTWINING"

In Part II, *supra*, we applied federal law and found that we lacked subject matter jurisdiction over plaintiffs' challenges to the Rule as applied to them. In Part III, *supra*, we applied New Jersey law and found that Randolph's facial challenge to the Rule is barred, but that Menke's is not. A component of defendants' argument which we have not yet addressed is their assertion that plaintiffs' facial attack on the Rule is "tantamount to a challenge to the State Court's decision" and that it

should therefore be dismissed in its entirety as a collateral attack on the New Jersey Supreme Court's decision, "without the need for considering whether *res judicata* would bar these challenges." Defendants' brief, pp. 15–16; Defendants' reply brief, pp. 8–9. The heart of this argument, which is based on footnote 16 of *Feldman*, 460 U.S. at 482–84, 103 S.Ct. at 1314–16, is that facial challenges to state law, even if not barred by reference to *Migra*, may be nonjusticable in the interest of federalism and comity.

In footnote 16, the Court expressed concern over the perceived tendency of federal courts to provide federal fora for federal constitutional challenges, even at the risk of intruding into areas peculiarly within the domain of state courts. Much of the footnote is concerned with a criticism of *Dasher v. Supreme Court of Texas, supra,* in which the Fifth Circuit expressed the view that a federal district court could consider any constitutional challenge to a state court action over which the United States Supreme Court has never had jurisdiction. The Court in *Feldman* expressed a narrower view:

> If the constitutional claims presented to a United States District Court are *inextricably intertwined* with the state court's denial in a judicial proceeding of a particular plaintiff's application for admission to the state bar, then the district court is in essence being called upon to review the state court decision. This the district court may not do.
>
> Moreover, the fact that we may not have jurisdiction to review a final state-court judgment because of a petitioner's failure to raise his constitutional claims in state court does not mean that a United States district court should have jurisdiction over the claims. By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state-court decision in any federal court.

460 U.S. at 483–84 n. 16, 103 S.Ct. at 1315–16 n. 16 (Emphasis added).

The discussion in footnote 16 contains two strands. The first expresses the Court's concern that federal courts, in addressing constitutional challenges to bar admission and discipline decisions, would intrude into an area more properly left to the state supreme courts. The Court suggested that treading carefully in cases involving the administration of state courts both takes into consideration the primary responsibility of state supreme courts for the administration of the court systems, and acknowledges the "historic relationship ... between the state and federal judicial systems." 460 U.S. at 484 n. 16, 103 S.Ct. at 1316 n. 16, quoting *MacKay. v. Nesbett,* 412 F.2d 846 (9th Cir.) (per curiam) *cert. denied* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969). The second strand concerns the mechanism for enforcing a limitation on the ability of the lower federal courts to consider claims previously rejected by state courts or in some way closely related to ("inextricably intertwined with") those previously addressed by state courts. As we have discussed in Part II, *supra,* this dictum foreshadowed the holding of *Migra*, decided the following year. We find the language in footnote 16 to be instructive for two reasons: first, it informs the discussion of the application of *Migra* to the present action, and second, it reiterates the strong view of the Court that federal courts should be cautious when addressing challenges to the administration of state courts. *See, e.g., Middlesex Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 434–35, 102 S.Ct. 2515, 2522–23, 73 L.Ed.2d 116 (1982).

Defendants urge us to take an expansive view of the language in footnote 16. In their view it allows us to dismiss plaintiffs' facial challenges to the rule—even those not barred by *res judicata*—because the "essential relief" plaintiffs seek is the reversal of a state court decision. We have considered this argument separately because we agree that the federal courts must proceed with caution whenever they adjudicate challenges to the administration of state courts. We turn to the lower court opinions which have addressed the language of footnote 16 to determine whether support exists for defendants' argument.

The Court's language in footnote 16 of *Feldman* "does not provide district courts with a bright line rule" by which to distinguish those claims which are beyond the court's jurisdiction by virtue of being "inextricably intertwined" with state court claims from those that are not. *Razatos v. Colorado Supreme Court*, 746 F.2d 1429, 1433 (10th Cir.1984) *cert. denied* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985). In the reported cases which have applied this language from footnote 16 of *Feldman*, the courts have "sifted" complaints to determine which claims state general, facial attacks on state law and which state claims attacking the specific applications of state law. *See e.g., Lowrie v. Goldenhersh*, 716 F.2d 401 (7th Cir.1983); *Czura v. Supreme Court of South Carolina*, 632 F.Supp. 267 (D.S.C.1986). This application of *Feldman* has been developed in a series of opinions of the Fifth Circuit.

In *Howell v. State Bar of Texas*, 710 F.2d 1075 (5th Cir.1983) *cert. denied* 466 U.S. 950, 104 S.Ct. 2152, 80 L.Ed.2d 538 (1984), the court found that "all but one" of plaintiff's claims were "inextricably intertwined" with a prior state court decision. "For example, [the plaintiff] alleged that he was deprived of his right to a jury trial as well as his right to a fundamentally fair trial." *Id.* at 1077. Such a claim was found to be without the court's jurisdiction. A "general constitutional challenge" to the state process was, however, found to be cognizable by a federal court after *Feldman*. *Id.* In *Thomas v. Kadish, supra,* the court examined the plaintiff's claims to determine whether they constituted a general attack on bar admission rules or whether they sought review of specific "judicial" action. The court determined, *inter alia,* that the complaint stated only claims attacking the application of the bar rules to the plaintiff. 748 F.2d at 278.

In *Nordgren v. Hafter, supra,* the court, after discussing the *Thomas* and *Howell* decisions, found that the plaintiff did meet the *Feldman* requirements for federal jurisdiction:

The record reveals that appellant mounts several "general constitutional challenges" which support subject matter jurisdiction within the meaning of *Feldman*. Feldman, for example, contended that a District of Columbia bar rule was unconstitutional because, *inter alia,* it created an irrebuttable presumption that only accredited law school graduates are fit to practice law. It was held that the district court had jurisdiction to hear this claim because it did not require review of the judicial decision of the District of Columbia as it related specifically to Feldman's situation; it only had to review the rule as promulgated.

789 F.2d at 337–38 (footnote omitted).

As part of this sifting process, the court must evaluate the substance of the claims, in order to determine whether claims which are nominally facial challenges in fact seek review of particular state court determinations. *See Reed v. Terrell*, 759 F.2d 472 (5th Cir.) *cert. denied* — U.S. —, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985); *Zimmerman v. Grievance Committee of the Fifth Judicial District of the State of New York, supra,* 726 F.2d at 86; *Rosquist v. Jarrat Construction Corp.,* 570 F.Supp. 1206 (D.N.J.1983).

It is clear that the cases which have applied the language of footnote 16 of *Feldman* have considered it no more than an explanation of the policy considerations underpinning the two-step analysis undertaken in *Feldman* itself. Following this analysis the courts first determine whether the complaint before them seeks direct review of a state "judicial" action; to the extent that it does, it is dismissed for lack of subject matter jurisdiction. Second, they determine whether the remaining claims are barred under the claim and issue preclusion law of the forum state; to the extent that the claims would be barred by state law, they are dismissed. That portion of the complaint which survives is then considered on the merits.

Defendants' interpretation of footnote 16 would add a third step to the analysis. By this proposed procedure we would dismiss

counts in a complaint which do not seek direct review of state court decisions and which are not barred by *res judicata,* but which are so closely associated with a state court proceeding that their adjudication in this court would violate principles of comity and federalism. We find that this interpretation is unsupported by the language of *Feldman* or the cases interpreting it. A rule such as that proposed by defendants— by which we would decline, on policy grounds, to consider cases within our grant of jurisdiction—would run contrary to the general rule that our exercise of jurisdiction is mandatory. *See Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Professional Plan Examiners of New Jersey v. La-Fante,* 750 F.2d 282, 290 (3d Cir.1984). We believe that the United States Supreme Court, were it to create a new exception to this general rule, would do so in definite, unambiguous terms. The language of footnote 16 does not contain such a signal.

As we have noted, the disposition of the *Feldman* case itself supports our interpretation. We have previously described the similarity between the proceedings experienced by Feldman and Hickey before the District of Columbia Court of Appeals and those experienced by Menke before the New Jersey Supreme Court. In *Feldman,* the Court found that jurisdiction was proper over the general challenges to the District of Columbia rules, and that the district court on remand could reach the *res judicata* issue. We find further support for our interpretation of *Feldman* in the United States Supreme Court's more recent opinion dealing with the constitutionality of bar admissions procedures. In *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), the Court reached the merits of a facial challenge to a residency requirement for bar admissions notwithstanding the fact that the plaintiff in the district court had previously "formally petitioned the New Hampshire Supreme Court for permission to become a member of the bar." 470 U.S. at 275, 105 S.Ct. at 1274. The Court's tacit finding that the district court properly considered the substance of the complaint is inconsistent with what we have determined to be defendants' interpretation of footnote 16 in *Feldman.*

In rejecting defendants' argument that notions of comity and federalism mandate the dismissal of Menke's challenge to the Rule on its face,[8] we do not find that feder-

---

**8.** The analysis of Randolph's case pursuant to the language of footnote 16 is consistent with our interpretation. We agree that Randolph's facial challenges to the Rule are "inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's application ... [and that] the district court is in essence being called upon [by Randolph] to review the state court decision." *Feldman,* 460 U.S. at 483–84 n. 16, 103 S.Ct. at 1315–16 n. 16. We also agree that Randolph's case is one which could be dismissed under the analysis of *Lowrie v. Goldenhersh, supra,* 716 F.2d at 407, as Randolph asks us to review a determination of a state court in an action in which she participated.

The cumbersome analysis derived from footnote 16 and *Lowrie* is, however, no longer necessary. The *Migra* decision obviates the need to refer to those older cases to determine when prior participation in state court actions will bar a plaintiff from litigating constitutional claims in federal court. There is no longer any need to perform a calibration of the extent to which Randolph's current action is "intertwined" with prior state court actions. Following *Migra,* we now simply import the *res judicata* standards of the forum state, and dismiss the complaint to the extent it would be barred by that doctrine in New Jersey's courts.

As we have found in Part III, *supra,* New Jersey law, applied pursuant to *Migra's* holding, does not bar Menke's facial claim to the rule although it does bar Randolph's. When we consider the merits of Menke's facial attack on the Rule, we will need to determine the Rule's scope and meaning. We will be bound for these purposes by the interpretation of the Rule rendered by the New Jersey Supreme Court in *IMO Randolph. See Connecticut Mutual Life Insurance Co. v. Wyman,* 718 F.2d 63 (3d Cir.1983). In adjudicating Menke's claim, then, we will necessarily consider the substance of the state court decision in an action litigated on behalf of her co-plaintiff in this action, Norma Randolph.

The plaintiffs' present association as co-plaintiffs therefore leads to anomalous results: Randolph's claims against defendants are dismissed because she had a full and fair opportunity to litigate her present claims in *IMO Randolph;* Menke's facial claims are not dismissed, and resolution of those claims depends in part on an

alism is an unimportant factor in this case. In viewing the past and present of the New Jersey court system, and in weighing the needs of the system against the First Amendment rights of court personnel, we will, of course, accord great weight to the factual and historical insights of the New Jersey Supreme Court. We do not reach the merits of the balancing process at this time.

## V. CONCLUSION

Defendants' motion is granted in part and denied in part. We find that we are without jurisdiction to consider either Randolph's or Menke's challenges to the Rule as applied by the New Jersey Supreme Court. We find that Randolph's challenge to the Rule on its face is barred by *res judicata*, while Menke's challenge to the Rule on its face is properly before this court for resolution on the merits.

interpretation of *IMO Randolph*. This oddity does not affect the analysis of the present motion. We will consider *IMO Randolph* not to pass on its merits, but only to gain the definitive interpretation of the Rule. Further, Menke's present association with Randolph does not al-

ter the fact that she was not a party to *IMO Randolph*, and as such cannot be barred from litigating claims determined among the parties to that action. *See Brunetti v. Borough of New Milford*, 68 N.J. 576, 587, 350 A.2d 19 (1975).